SAMUEL R. PUTNAM *vs.* THE MERCANTILE MARINE IN-
SURANCE COMPANY.

A commission merchant, to whom the cargo of a vessel is consigned for sale, has an
insurable interest in his expected commissions, and may insure the same while the
vessel is on her voyage.

THIS was an action of assumpsit on a policy of insurance, made by the defendants, on the 11th of March 1835, by which the plaintiff, "for Alfred Barrow, Putnam & Co., payable to S. R. Putnam, in case of loss," insured "$1500 on commissions on the cargo of the brig Progress, at and from St. Helena to Antwerp." The policy contained this clause : "Company not liable, unless the loss on said cargo amounts to more than 50 per cent., in which case, they are to pay as for a total loss ; but in case any accident happens by the perils, which insurers assure under the usual form of policies issued in Boston, preventing said vessel's reaching its port of destination, as above, then, (unless the property is reshipped, and the assured realize 50 per cent. of their commissions on the same,) the company is liable for a total loss." The commissions were valued at the sum insured.

The declaration alleged that Alfred Barrow of Antwerp, and Samuel R. Putnam of Boston, were jointly interested in the commissions aforesaid ; that the policy was made to and for the use and account of said firm, and that the plaintiff was their authorized agent to effect said insurance ; that the vessel sailed from St. Helena for Antwerp, with a cargo, and was lost, about the 10th of March 1835, by the perils of the sea ; and that thus the said commissions were wholly lost.

The facts of the case, which appeared on the trial, were proved by the deposition of Charles Scholfield, supercargo of the Progress ; and sundry letters and extracts from letters were also introduced into the case, together with the bills of lading of the cargo ; and it was admitted by the defendants, that the plaintiff and said Barrow had established a commission house at Antwerp, where Barrow resided, and that they there carried

on commission business, had warehouses, clerks, &c., held themselves out as ready to receive business, and had frequently sold cargoes for the owners of the cargo of the Progress.

The letter of instructions from the owners of the Progress to the master, Joseph Easterbrook, and the supercargo, Charles Scholfield, were dated January 4th 1834. The instructions were given to them, as joint supercargoes, to proceed from Boston to Sumatra, for a cargo of pepper, and, if they could fill the vessel, then to proceed to Gibraltar : and in case they should there meet no instructions from the owners, to proceed to such ports in the Mediterranean as should promise the best market for their cargo, sell it, and settle the voyage in conformity to the freight agreement, and remit as they should be directed : That if they should fail to get a full cargo of pepper, they should go to Manilla, where they were authorized to sell any pepper they might have, and procure sugar, and some hemp and coffee ; but if they should have a part of their cargo of pepper undisposed of, they would not need hemp, and should proceed to Antwerp with their pepper, coffee and sugar : But if sugar should be higher than their limits, then they should ballast only with sugar, and proceed to Boston : That if they should get as much as two thirds of a cargo of pepper on the coast, and could not fill up there, they were authorized to go to Padang, and lay out the residue of their funds in coffee ; in which case, they were to proceed to Antwerp : That if they should go to Padang, as they would not have funds to fill the vessel, they were authorized to take freight, if to be had; and, in such case, to go to any port in Holland, if required, as they might think best, and finish their cargo there : That if they should load with pepper on the coast, and return to Europe, so that they should find that they could probably reach Antwerp by the middle of November, they should go to Antwerp instead of Gibraltar ; otherwise, to Gibraltar. For their services, as joint supercargoes, they were to receive 3 per cent. of the return cargo, or the net proceeds of the same.

It was in evidence, that the master and supercargo sailed under these instructions, procured about a quarter of a cargo of pepper

at Sumatra, proceeded to Manilla, and there completed their lading : That they wrote to their owners, from Manilla, under date of October 21st 1834, and sent the invoice and bills of lading of the cargo on board the Progress ; adding that they had on board as much as she would safely carry, and that they should proceed, without delay, to Antwerp : That they accordingly sailed for Antwerp in November, and stopped, on their way, at St. Helena, where they wrote to their owners.

The aforesaid bills of lading stated that the cargo was shipped for account of the owners, (naming them,) and bound for Antwerp, to be delivered unto Messrs. Charles Scholfield and Joseph Easterbrook, or to their assigns paying freight, as per agreement.

The Progress proceeded from St. Helena for Antwerp, and in March 1835 ran upon a bank off Flushing, where she lay two nights and nearly two days. A part of her cargo was discharged into lighter boats, while she lay on the bank, and some sugar was thrown overboard. After she was got off, the rest of the cargo was unladed, and the whole was stored at Flushing, and the brig was condemned as unseaworthy. As soon as the cargo was taken from the brig, said Scholfield went to Antwerp, and saw Mr. Barrow, who showed him a letter from the owners, authorizing him (Barrow) to order the brig either to Antwerp or to Rotterdam, as he should think best. And Scholfield deposed, that he had no management of the brig, after arriving at Flushing, because those orders superseded his instructions : That Barrow, after some conversation with Scholfield, thought it best that the cargo should be sent to Rotterdam, as they (Scholfield and the master) would have much trouble in getting it to Antwerp, on account of the non-intercourse between Holland and Belgium ; and great expense would be necessary to ship it in Dutch lighters to the line, and then have it transhipped into Belgium lighters ; and that this proceeding would have injured the Manilla bags, which were very frail.

The cargo was shipped to Rotterdam, and sold at auction for the benefit of the underwriters.

In answer to interrogatories, Scholfield deposed, that but for

the accident, he should have gone directly to Antwerp, having a Manilla cargo ; that Barrow ordered him to send the cargo to Rotterdam ; that he did so, and consigned it to the house of Wilkins, Blockhuysen & Co. under directions from Barrow, in consequence of instructions from the owners of the cargo : That there was very little difference between the markets of Rotterdam and Antwerp, for the sale of the cargo ; although he (Scholfield) considered Antwerp rather the best, and should have sent it there, if it could have been done without extra trouble or expense : That he and the master were ordered — by a letter written to them by the owners, and received after his (Scholfield's) arrival at Antwerp, and after Barrow had shown to him the other letter, as above stated — to place the cargo in the hands of Barrow, Putnam & Co.: That the brig was bound from Manilla to Antwerp, but they expected to receive instructions from their owners, at Flushing, but should not have waited for them.

On the 14th of March 1835, Barrow, Putnam & Co. wrote from Antwerp to the master and supercargo of the Progress, stating that they had just heard that the brig was stranded, but that the cargo would be saved, and added, " we have authority to send the vessel to Holland, if it should appear most for the interest of the parties concerned. We do not know how your cargo is composed, but we suppose chiefly of sugar, which will answer well here. If the brig cannot be got off, we think you would do well to send up the cargo in lighters." On the 17th of the same month, they wrote again, saying, " if the brig cannot come up, the cargo must be sent in lighters to the fronliers, and we will then send Belgian lighters to bring the merchandize up here. Until we hear from you, we cannot take any steps." On the 19th of the same month, Scholfield being then in Antwerp, Barrow, Putnam & Co. addressed to him a letter, saying, " we give you annexed an extract from letters we have received from owners of the Progress's cargo. Under the unfortunate circumstances in which the vessel and cargo are placed, we recommend to you to address yourself to Messrs. Wilkins, Blockhuysen & Co. of Rotterdam, for the sale of the cargo, and

33 *

the general management of your business. We address these gentlemen direct, and desiring them to write to you at Flushing, advising the best steps to be taken. We suppose they will recommend that no part of the cargo be sold at Flushing." The extract, which was annexed to this letter, was thus : " Should the Progress arrive with you, she will discharge her cargo at Antwerp, unless more advantageous to go to Holland ; in which case, we depend on your advising the agents." This extract was without date, but it appeared from Scholfield's deposition, that it was January 18th 1835 : And Scholfield also deposed, that a day or two afterwards, and before he went to Rotterdam, a letter from the owners of the cargo, dated July 29th 1834, (nearly seven months after the brig sailed from Boston,) was put into his hands, directed to him and the master, and containing these directions : " In the event of your going to Antwerp with your cargo, you will consign our property to Messrs. Barrow, Putnam & Co. and have it sold, and the voyage settled according to freight agreement." This letter was addressed to them at Antwerp, care of Messrs. A. Barrow, Putnam & Co.

Scholfield further deposed, that if the master and he had received no letters at Antwerp, they should have chosen the consignees : That the cargo was sold at Rotterdam for a large profit on the original cost ; but that the loss, by reason of the property thrown overboard and the sea damage, was about ten per cent : That the cost of carrying the cargo to Antwerp, in two sets of lighters, would have been double the cost of carrying it to Rotterdam, which was done by one set.

The defendants insisted that, on this evidence, no such loss was shown to have happened, as would entitle the plaintiff to recover, even if he had any interest in the subject of the insurance ; and that if the loss had happened, yet the plaintiff and his partner, Barrow, had no insurable interest covered by the policy.

By consent, a verdict was taken for the plaintiff, subject to the opinion of the whole court, who were desired to draw such inferences from the facts stated, as a jury would be warranted in drawing.

The argument was had at the last March term.

*C. G. Loring & Crowninshield*, for the plaintiff.

*W. D. Sohier*, for the defendants.

HUBBARD, J. Two questions are presented for the consideration of the court in this case : The one, whether the plaintiff had an insurable interest in the subject matter of the insurance ; and the other, if the plaintiff had such insurable interest, whether a loss has happened for which the defendants are answerable under their contract.

In the progress of the law of insurance, many cases have arisen for legal investigation, which exhibit the varieties of interest that grow out of the complicated business of commercial communities. Originally, the owners of the vessel and cargo, and the designated voyage, were alone the subjects of the contract ; but, as commerce has been extended, the rights of persons, other than those of the specific owners of the property, have become involved in the results of the voyages. In consequence of it, the law of insurance has been most reasonably extended to embrace within its provisions cases, where the parties, having no ownership of the property, have a lien upon it, or such an interest connected with its safety and its situation, as will cause them to sustain a direct loss from its destruction, or from its not reaching its proper place of destination. Such rights have received protection, and the expectation of profits, the loan upon mortgage or respondentia, the advances of a consignee, an agent or factor, and the commissions of a master or supercargo, are all now the well recognized subjects of insurance.

The contract before us is that of an insurance on the expected commissions of a merchant upon goods on shipboard, in the progress of the voyage, and which are consigned to him for sale ; but upon which he has made no advances, nor accepted bills on the faith of the consignment. This presents a case which has not yet been decided, and the question is, whether it is embraced within the principles, by which contracts for the insuring of profits, and of expected freight, and commissions of supercargoes and masters, have been held valid : or whether it

is to be classed with wager policies, on the ground that it is a case of mere expectation, not coupled with an interest.

The facts spread before us are these : The plaintiff is a part nei in a mercantile house in Antwerp, which receives the goods of foreign merchants to sell on commission. The owners of the brig Progress had despatched her to India for a cargo, to be carried to and sold in Europe ; and if a certain cargo was procured, it was to be carried to Antwerp. Such a cargo was obtained, and the vessel sailed for that port. While at Manilla, the supercargo wrote to his owners. On receiving the letters, they wrote, it would appear, (so far as we can gather from the correspondence, the whole not being produced on the trial,) to the house in Antwerp, consigning the cargo to them. They also wrote to the master and supercargo, informing them of the consignment, and directing them to their consignees for instructions. They also gave discretionary orders to the consignees to send the vessel to Holland, if the market there was preferable to that at Antwerp. With the knowledge of these facts, and that the vessel had been heard from at St. Helena, Putnam, the partner in Boston, procured insurance on the commissions the house would receive if the vessel should arrive, as on a voyage from St. Helena to Antwerp.

There is, then, a direct consignment of the cargo to the plaintiff's house ; the commissions will be earned if the vessel arrives and the cargo is sold there ; and if she is lost on her way, or the voyage to Antwerp is defeated by one of the perils insured against, the plaintiff will sustain a certain loss.

The case, in its essential features, is like that of an insurance on profits, depending on the arrival of the vessel at a particular port, and founded on like expectation. It partakes not of the nature of wager ; for, in the event of the wager, independent of the policy, the party insured has nothing to lose. Here, if there were no insurance, the party would lose his commissions, if there should be a loss of the cargo.

The subject of an interest like the present is treated of in the celebrated case of *Lucena* v. *Craufurd*, 2 New Rep. 292. In the opinion, in which seven of the judges concurred, it was

said, that " a vested interest is not necessary to give the right
of insuring.   The commissioners had a contingent interest ; and
supposing the intentions of the crown to remain unaltered,
nothing stood between them and the vesting of that contingent
interest, but the perils insured against.   It is stated, that they
cannot be entitled to an indemnity ; for they had nothing to lose.
But in fact they lost, by the perils of the sea, what but for those
perils would have vested in them absolutely.   At the time both
of the insurance and the loss, their title, like that of a consignee,
was inchoate ; occupancy was necessary to perfect it.   It is
true, that their interest is revocable.   But so is that of a con-
signee.   The owner may at any time appoint another consignee
or agent ; he may change his intention in the course of the
voyage.   It is very common to direct the captain to touch at
particular ports for new instructions.   The powers of a con-
signee, therefore, are not more permanent than those of the
commissioners."   And in page 301, Mr. Justice Lawrence
observed, that "insurance is a contract, by which the one party,
in consideration of a price paid to him adequate to the risk,
becomes security to the other, that he shall not suffer loss, dam-
age or prejudice, by the happening of the perils specified, to
certain things which may be exposed to them.   If this be the
general nature of the contract of insurance, it follows that it is
applicable to protect men against uncertain events which may in
any wise be of disadvantage to them ; not only those persons to
whom positive loss may arise by such events occasioning the
deprivation of that which they may possess, but those, also, who
in consequence of such events may have intercepted from them
the advantage or profit which, but for such events, they would
acquire according to the ordinary and probable course of
things."

This reasoning is sound and sagacious.   It introduces no
novel principles into the law ; it advances no position hazardous
to regular trade, though its tendency is to enlarge the legitimate
subjects of insurance.   We cannot but be struck with the pointed
bearing, which the foregoing remarks have on the case at bar,
and we feel justified in making a practical application of them

See also the cases of *Flint* v. *Le Mesurier*, Park on Ins. 403. *Barclay* v. *Cousins*, 2 East, 544. *Law* v. *Goddard*, 12 Mass 112. *De Forest* v. *Fulton Fire Ins. Co.* 1 Hall, 84.

There is also a case in our own books, where the right of the consignee to effect insurance on his commissions is mentioned without expressing any doubt in regard to it. *French* v. *Hope Ins. Co.* 16 Pick. 397. This was an insurance on profits on merchandize. It was held that the plaintiff had a substantial interest at risk, for, if the ship had arrived safely, he would have been entitled to profits ; and they depended on her safe arrival. The learned judge, who delivered this opinion, says, " the objection principally relied upon is, that the plaintiff was not the owner of the merchandize ; that he could not have insured the goods, and *a fortiori* not the profits on the goods which did not belong to him. The rule, if received to the extent laid down, would prevent the insurance of commissions on goods consigned to the plaintiff. If, in the case of a consignee, the goods should arrive safely, he would be entitled to commissions on the sale. So in the case at bar, if the goods had arrived, the plaintiff would have realized a profit. The cases seem to us to be perfectly analogous. In each, the party claiming profits or commissions has either to run the risk and bear the loss himself, or to get insurance against marine risk. In each case he has a real interest to protect."

The case at bar, indeed, stands on the very borders of the line — which may be deemed almost shadowy — where interest ends and expectation begins ; but the line, however thin, must be drawn somewhere, or the difference between wager policies and those coupled with an interest must cease. And upon consideration we are of opinion, that the regular consignee of goods has an interest in his expected commissions, equivalent to that of expected profits, and that such commissions are the lawful subject of insurance.

The second question for our examination is, whether a loss has happened, for which the defendants are answerable under their contract.

The parties differ in their views of the evidence, and they

desire the court to draw such inferences as a jury would be warranted in making. The fact in difference, and upon which this part of the case turns, is, whether the cargo of the Progress was sent to Rotterdam in consequence of intelligence, alleged by the defendants to have been received from the owners, subsequent to March 14th, when Barrow wrote his letter to the supercargo ; or because Rotterdam furnished the best market for the sale of the cargo ; or whether, as the plaintiff alleges, it was solely owing to the wreck of the vessel, the importance of saving the expense of double lighterage, and the better to protect from damage the part of the lading consisting of Manilla sugar, that the cargo was forwarded to Rotterdam instead of Antwerp.

The defendants infer that letters subsequent to March 14th were received by Barrow, because his first orders were, to have the cargo forwarded to Antwerp ; and in five days after, he directed it to be sent to Rotterdam. But this change of orders might well have taken place, as the difficulty of getting the cargo to Antwerp became more apparent to him, without supposing that new orders had been received from the owners. As the whole correspondence of the owners and the house in Antwerp has not been put into the case by either party, we cannot say that there were any letters received by the house, between the 14th and the 19th of March, when the positive orders were given by Barrow to forward the cargo to Rotterdam. On the other hand, the letter from Barrow to the supercargo, of March 14th, contains this clause : " We have authority to send the vessel to Holland, if it should appear most for the interest of the parties concerned ; " and on the 19th, at Antwerp, Barrow gave him an extract from the letter of the owners, which has this passage : " Should the Progress arrive with you, she will discharge her cargo at Antwerp, unless more advantageous to go to Holland : " From which we are led to infer, that the passage in the letter of the 14th is derived from the letter of the owners from which the extract is given on the 19th, and that no further advices had been received from the owners.

The facts, in regard to the forwarding of the cargo to Rotterdam instead of Antwerp, rest upon the testimony of Scholfield, the supercargo ; from which it appears that Barrow ordered the cargo to be sent in lighters to Rotterdam, because of the greater difficulty or increased expense and risk of getting it to Antwerp ; and that the prices were about the same, though the market at Antwerp was rather the best.   We therefore come to the conclusion, that it was owing solely to the perils of the sea, by which the vessel was totally lost, that the cargo did not reach Antwerp, its port of destination.

The terms of the contract are special.   In it the parties agree, " in case any accident happens by the perils which insurers assure, under the usual form of policies issued in Boston, preventing said vessel's reaching its port of destination as above, then (unless the property is reshipped, and the assured realize 50 per cent. of their commissions on the same) the company is liable for a total loss."   It appears from the facts as proved, that Antwerp was the port of the vessel's destination ; that she was prevented from reaching it by the perils of the seas, which risks are assumed in policies issued in Boston ; that in consequence of these perils, the cargo was not reshipped, and the assured lost their commissions.   The plaintiff's case is therefore sustained, and the defendants are responsible on their contract.

*Judgment on the verdict.*